**E-FILED**
Thursday, 17 June, 2010  11:41:07 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| EDDIE HARDWICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.   09-cv-1106 |
| SUNBELT RENTALS, INC. and | ) | |
| INTERNATIONAL UNION OF | ) | |
| OPERATING ENGINEERS LOCAL NO. | ) | |
| 965, | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R  &  O P I N I O N

This matter is before the Court on Defendants,' Sunbelt Rentals, Inc. ("Sunbelt") and International Union of Operating Engineers Local No. 965 ("Union"), respective Motions for Summary Judgment (Docs. 29 & 34), and Plaintiff Eddie Hardwick's Motion for Partial Summary Judgment (Doc. 31). Also pending is Plaintiff's Motion to Strike his original Reply Memorandum in Support of his Motion for Partial Summary Judgment (Doc. 50), which is granted.[1] For the reasons stated below, Sunbelt's Motion for Summary Judgment is granted, the Union's Motion for Summary Judgment is granted, and Plaintiff's Motion for Partial Summary Judgment is denied.

---

[1]   The filings in this case have been extremely confused.  Plaintiff had filed, contemporaneously with a Motion for Leave to File Excess Pages (Doc. 44), a combined 10-page Reply to the Defendants' separate Responses to his Motion for Partial Summary Judgment (Doc. 43).  The Court denied the Motion for Leave to File Excess Pages, instead instructing Plaintiff to file a separate Reply to each Defendant's Response.  (1/8/10 Text Order).  Plaintiff did so, but his 10-page Reply stayed on the docket.  Plaintiff's Motion to Strike asks the Court to strike this superseded Reply, and the Court agrees that this is proper.

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In ruling on a motion for summary judgment, the court must view the evidence on record in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Sciences Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant; however, the court is not required to draw every conceivable inference from the record. *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). The court draws only reasonable inferences. *Id.*

It is not the court's function to scour the record in search of evidence to defeat a motion for summary judgment. Instead, the court relies on the non-moving party to identify the evidence which creates an issue of triable fact. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (*quoting Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, however, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

BACKGROUND[2]

Sunbelt's business is the rental of industrial machinery, vehicles, and tools. (Doc. 4 at ¶ 2). Plaintiff was employed at Sunbelt's Decatur, Illinois location as shop foreman for several years, until January 28, 2008. (Doc. 4 at ¶ 4). During the period relevant to this litigation, the Union represented the Decatur employees who were full- and part-time mechanics, shop foremen, lead mechanics, truck drivers, and yard personnel. (Doc. 4, Ex. A at 2). There was a collective bargaining agreement ("CBA") between the Union and Sunbelt in place, which was effective from September 1, 2007 to August 31, 2012. (Doc. 4, Ex. A at 2). This CBA included a provision entitled Job Security as Article 19; it provided that:

> If Employer opens new facilities within the geographical jurisdiction of Local 965 (counties: Adams, Schuyler, Brown, Pike, Cass, Morgan, Scott, Menard, Sangamon, Logan, Christian, Dewitt, Macon, Piatt and Shelby), and the Decatur, Illinois facility closes, any displaced bargaining unit employee from Decatur who is not on suspension or probation will be offered a lateral position at the new facility.

(Doc. 4, Ex. A at 2).

In early 2007, Sunbelt employees, including Plaintiff, became aware that Sunbelt might close its Decatur facility and open new facilities in Springfield, Illinois, and Champaign, Illinois. (Doc. 4 at ¶ 6). On January 10 or 11, 2008, Sunbelt announced that it would close its Decatur facility.[3] (Doc. 4 at ¶ 6). On that

---

[2]    These background facts reflect the Court's determination of the undisputed facts, unless otherwise noted. Facts that are omitted are immaterial; if an included fact is immaterial to the Court's determination, this will be noted.

[3]    Plaintiff's Complaint indicates that the announcement was made on January 11, and the Union appears to agree, but Sunbelt's Motion for Summary Judgment, citing to Plaintiff's deposition, indicates that it was made on the 10th. (Doc. 4 at ¶6;

day, Rick Moss, Sunbelt's District Manager, called each of the employees, including Plaintiff, individually into his office to discuss the possibility of transfers; Plaintiff was offered a transfer to Sunbelt's East Peoria facility.  (Hardwick Dep. at 71-74).  Also on January 11, 2008, O'Hara wrote to Sunbelt's attorney to express the Union's grievance over Sunbelt's apparent refusal to transfer the Decatur employees to the new Springfield facility.  In this letter, O'Hara also suggested that the Decatur employees be transferred to two other area facilities, with the option of transferring to Springfield when it opened.  (Doc. 35, Ex. 27).

The Decatur Sunbelt employees, including Plaintiff, met at the Union hall on January 12, 2008 to discuss the closing of the Decatur facility, and were advised by the Union not to resign from Sunbelt, but to await layoff with the closing of the facility; O'Hara explained that he didn't know what the effect of a resignation would be on the employees' ability to be reinstated by Sunbelt.  (Daniels Dep. at 11-12, 39-41; Hardwick Dep. at 251-53).  After this meeting, Plaintiff told his wife that he had been advised not to resign from Sunbelt, and that it would be harder to get reinstatement if the employees did quit.  (Carla Hardwick Dep. at 132-34).  The Union officers believed that if an employee resigned prior to being laid off, he may forfeit his entitlement to backpay if the Union won in arbitration.[4]  (Minick Dep. at 66; Zahn Dep. at 46).

---

Doc. 29 at 7; Doc. 34 at 3).  None of the parties disputes the others' citation of the dates.  The Court finds that this slight discrepancy is immaterial.

[4]    Sunbelt presents this as a statement of fact, which Plaintiff disputes.  Plaintiff, though, offers no evidence to contradict that this was the belief of the Union officers.  (Doc. 35 at 2).  The evidence cited by Plaintiff, his own affidavit and the January 11, 2008 letter from O'Hara to Sunbelt's attorney, do not belie the

On January 15, 2008, Plaintiff and the other Decatur union members signed a grievance indicating their intent to "reserve and retain [their] contractual rights pursuant to Article 19…and any right [their] may have to transfer to a position to a Sunbelt facility within the jurisdiction of" the Union;" Plaintiff gave this grievance to Moss and Brandon Tancak, the manager of the Decatur facility, on January 15, 2008. (Hardwick Dep. at 78, 69, 80-81; Doc. 30, Ex. 3 at 26; Zahn Dep. at 101). The Union held another meeting with the Decatur employees on January 18, 2008, and distributed grievance letters it had drafted for each employee; Plaintiff's letter indicated that he was declining the offered transfer to East Peoria, wished to retain his rights under Article 19, and grieved the failure of Sunbelt to offer him a position at Springfield. (Daniels Dep. at 12-13; Zahn Dep. at 99-100; Doc. 30, Ex. 9 at 2).

By letters dated January 25, 2008, and January 30, 2008, Plaintiff resigned his employment at Sunbelt. (Doc. 4 at ¶ 9; Doc. 34, Exs. 1 & 2). In the January 25, 2008 letter, Plaintiff stated that he resigned from Sunbelt "due to:" the failure of Sunbelt to transfer him to the Champaign facility as previously promised[5] and the "poor leadership skills from our Team Leader-Rick Moss;" he also sought compensation for certain extra work that he had performed, and a severance

---

assertion that the Union was concerned about the negative effect of employees' resigning.

[5]   In his affidavit, Plaintiff asserts that his "interest in permanently transferring to Champaign ended when Local Union 965 and Sunbelt negotiated a new Collective Bargaining Agreement for the Decatur, Illinois facility, during September 2007." (Hardwick First Supp. Aff. at ¶ 12).

package offered in lieu of the transfer to East Peoria.[6]  (Doc. 34, Ex. 1).  Plaintiff indicated in that letter that he would no longer be available to negotiate, "due to [his] next career," and did not mention any desire to retain his rights under Article 19 or to be transferred to Springfield.[7]  (Doc. 34, Ex. 1).  Plaintiff hand-delivered this letter and turned in his keys to the Decatur facility to Brandon Tancak, of Sunbelt, on January 25, 2008.  (Hardwick Dep. at 93-95).  A copy was also delivered to the Union, which faxed a copy to O'Hara on January 30, 2008.  (Hardwick Aff. at ¶ 14; Doc. 32, Ex. 4).  Sunbelt refused to accept the January 25, 2008 letter, as it was unsigned, so Plaintiff signed a revised letter and sent it to Sunbelt on January 30, 2008; this letter discussed only the claim to compensation for extra work. (Hardwick Aff. at ¶¶ 15-16; Doc. 32, Ex. 5).

Sunbelt relayed Plaintiff's request for compensation for extra work to the Union, which assisted Plaintiff's wife in drafting a request for the unpaid compensation and submitted the request to Sunbelt.  (Hardwick Dep. at 119-20). The Union did so though Plaintiff's claim was stale under Article 6 of the CBA. (Carla Hardwick Dep. at 151-52).  Sunbelt reimbursed Plaintiff for the unpaid wages.  (Hardwick Dep. at 119-20; Carla Hardwick Dep. at 151-52; Minick Second Dep. at 126, 128-29; Zahn Dep. at 28).

---

[6]     Sunbelt denies that a severance package was offered; the Court finds this detail immaterial.

[7]     In his deposition, Plaintiff testified that he did not show this letter to anyone at the Union prior to delivering it to Sunbelt, and that he did not do so because he "had already reserved [his] right under Article 19 to get my job at the Springfield store."  (Hardwick Dep. at 100).

Plaintiff's new job did not work out, and he subsequently returned to Illinois and sought reinstatement with Sunbelt.  (Hardwick Dep. at 98-99, 187-88).

On February 29, 2008 Sunbelt closed the Decatur facility. (Hardwick Dep. at 70-71; Moss Aff. at ¶ 7). It opened the Springfield facility on either July 1, 2008 or August 1, 2008.[8] (Hardwick Aff. at ¶38; Moss Aff. ¶ 11).

The Union filed a grievance under Article 19 of the CBA, covering all the union members employed at the Decatur facility, which ended in an arbitration held on July 25, 2008. (Doc. 4 at ¶ 10; Doc. 4, Ex. A at 1-2). The arbitrator was aware that Plaintiff had resigned on January 25, 2008, but was not informed of the reasons given for his resignation in the January 25, 2008 letter. (Doc. 32, Ex. 12 at 104-05; Zahn Aff. at ¶ 3). The arbitration award provided that:

> The employer is to offer lateral transfers to its Springfield facility to those employees within the bargaining unit at the time of its January 11, 2008 announcement of the Decatur center's closing. Further, to the extent that any of those employees suffered loss of wages as a result of its failure to do so, those employees shall be entitled to back pay.

(Doc. 4, Ex. A). The Union had doubts about Plaintiff's ability to recover backpay under the arbitration award, as he had resigned prior to the closing of the Decatur store.[9] (Zahn Dep. at 46, 55-56, 65).

---

[8]    Plaintiff and Sunbelt dispute the date the Springfield facility opened, but the Court finds that this discrepancy is immaterial to the disposition of these Motions.

[9]    Plaintiff contends in his affidavit that Sunbelt's assertion that the Union had such doubts is false, as "Sunbelt could not, and should not have, any doubts about the enforcement of the Arbitration Award, which clearly required a lateral transfer for [Plaintiff] to Springfield, Illinois with back pay." (Hardwick First Supp. Aff. at ¶ 15). Plaintiff provides no other evidence to dispute Sunbelt's assertion as to the Union's doubts. Setting aside the facts that Plaintiff asserts *Sunbelt*, rather than the Union, could not have these doubts and that argument alone is an inappropriate basis to dispute facts, this "dispute" appears to merely contend that the Union's doubts were unreasonable, not that they were not sincerely held; the reasonableness of the Union's beliefs will be addressed below.

The Union demanded in a letter to Sunbelt dated October 20, 2008, that the three union employees, Joe Daniels, Greg Brehm, and Plaintiff, who had not been returned to work pursuant to the arbitration award, be transferred to or hired for the Springfield facility, and be paid backpay.  (Doc. 34, Ex. 3).  By a letter dated November 4, 2008, Sunbelt responded to the Union's letter, requesting a negotiating session regarding Plaintiff's status, as he had resigned prior to the closing of the Decatur facility and had expressed complaints about Moss.  In addition, Sunbelt noted that the shop foreman position (which would be a lateral transfer for Plaintiff) was currently filled by a union member.  (Doc. 34, Ex. 4).  The Union offered, in a letter dated November 7, 2008, to resolve the issue of these three employees by waiving back pay for the employees who had not been returned to work in return for their immediate reinstatement.  (Doc. 34, Ex. 5).  Sunbelt accepted the Union's offer by a letter on the same day.  (Doc. 34, Ex. 6).[10]  Daniels and Brehm were reinstated at the Springfield store, without backpay, pursuant to this agreement.  (Zahn Dep. at 42, 120).

On November 10, 2008, the Union and Sunbelt were negotiating a successor CBA for the Springfield facility.  At a "sidebar" during this negotiation session, representatives of the Union and Sunbelt discussed whether there were any options to resolve the arbitration award as to Plaintiff.  (Minick Dep. at 22-25, 105; Zahn

---

[10]   Plaintiff asserts that he "had not agreed to waive back pay, had not been asked to waive back pay, and did not know about the letter agreement/proposals when the letters were exchanged on November 7, 2008."  (Doc. 38 at 3).  First, Plaintiff provides no support for this proposition - the evidence he cites simply documents the exchange of letters.  Further, the Court finds this immaterial, as the Union was Plaintiff's exclusive bargaining agent, and did not need to discuss every negotiating proposal with him as they were happening.

Dep. 20-21).  At the sidebar, Sunbelt expressed hesitancy to reinstate Plaintiff, as he had criticized Rick Moss' management style in his January 25, 2008 resignation letter; after Union's Local Business Manager Michael Zahn indicated that he was not aware of such criticism, Sunbelt's representatives gave him a copy of the letter, which he had not previously seen.[11]  (Minick Dep. at 105-06; Zahn Aff. at ¶¶ 4-5; Zahn Dep. at 23).  After reading this letter, Zahn informed Sunbelt that he had been informed that Plaintiff had made comments against Moss, and indicating that he would be disruptive if employed at Springfield.[12]  (Moss Second Dep. at 23-24, 28-30; Zahn Dep. at 106; Zahn Aff. at ¶ 6).  Plaintiff denies making any such statements.  (Hardwick First Supp. Aff. at ¶¶ 22-23, 25-34).  O'Hara suggested that as an alternative to the previous agreement of a transfer to Springfield with no backpay, Sunbelt could pay Plaintiff $3500 if he would resign as of his January 25, 2008 letter and seek no further action, to which Sunbelt agreed, though Sunbelt did

---

[11]     Plaintiff asserted in his affidavit that Moss testified that he "did not show Michael Zahn a copy of my resignation letter" at the sidebar.  (Hardwick First Supp. Aff.  at ¶ 21).  The cited portions of Moss' deposition, though, do not show this - Moss testified that he could not recall whether Sunbelt provided any documents to the Union, and that the Union did not provide any documents to Sunbelt.  He also could not recall whether there was a conversation regarding Plaintiff's resignation letters.  (Moss Second Dep. at 20-21).  None of his testimony shows that Sunbelt's representatives did not show the letter to Zahn, a Union representative, as testified to by Minick and Zahn.

[12]     As Plaintiff disputes making these statements, the Court construes this factual dispute in his favor, finding that he did not make the statements.  For the sake of clarity, however, the Court notes that the Union's Local President Dennis Minick testified that on two occasions Plaintiff told him that he would like to be in a locked room with Moss, and that Plaintiff would be disruptive if transferred to Springfield.  Minick also testified that Plaintiff had made a similar statement to Joe Daniels.  (Minick Dep. at 15-16, 18-19, 21, 31-33).

not withdraw the offer to employ Plaintiff at Springfield without backpay.  (Minick Dep. at 24-25, 105-06; Moss Second Dep. at 25, 34).

Plaintiff met with Zahn, the Union's Local President Dennis Minick, and O'Hara on November 15, 2008.  (Hardwick Dep. at 198-201, 271-74).  Zahn and Minick testified in their depositions that Plaintiff was informed at the meeting that he could either accept the lateral transfer to Springfield without backpay or resign for $3500; they assert that Plaintiff indicated he would accept some severance pay and resign, but wanted O'Hara to try to negotiate for more money from Sunbelt. (Minick Dep. at 47-48, 106-08; Zahn Dep. at 29-33, 42-44).  Plaintiff testified at his deposition that he was only told at this meeting that he could accept $300 and resign; he denied that he was ever told, prior to this litigation, that Sunbelt had offered a lateral transfer to Springfield without backpay.[13]  (Hardwick Dep. at 198-201, 271-74; Hardwick First Supp. Aff. at 35).  By a letter dated November 17, 2008, Plaintiff informed the Union that he had considered the "options" presented at the November 15, 2008 meeting, and that he wanted a lateral transfer to Springfield with backpay under the arbitration award.  (Doc. 34, Ex. 19).

O'Hara wrote a letter to Plaintiff on December 1, 2008, explaining the Union's position as to the application of the arbitration award to him.[14]  (Doc. 32,

---

[13]    Plaintiff states that there is no written documentation of the Union's having relayed the lateral transfer with no backpay offer to him.  (Doc. 32 at 13; Doc. 38 at 4).  The Union agrees, but notes that there is no written documentation of this sort for any of the three employees affected by the lateral transfer negotiations.  (Zahn Aff. at ¶ 7).

[14]    Plaintiff contends that O'Hara's letter "falsely states that to be covered by the Arbitration Award Plaintiff had to be employed at Sunbelt's Decatur facility at the time it closed on February 28, 2008 and that this letter was presented to the

Ex. 20).  O'Hara wrote that, because Plaintiff had informed Sunbelt that his resignation was due to Sunbelt's refusal to transfer him to Champaign, he was ineligible for the right to transfer to Springfield with backpay under the arbitration award; O'Hara had therefore advised the Union that it was his opinion that Sunbelt did not breach the award by failing to reinstate Plaintiff.  (Doc. 32, Ex. 20 at 2).  On December 9, 2008, Zahn met with Plaintiff and his wife to discuss the Union's position, and Plaintiff explained that he still believed he was entitled to both reinstatement and backpay.  (Zahn Dep. at 59-60; Hardwick First Supp. Aff. at ¶ 38).

On December 18, 2008, Minick, acting on Zahn's direction, conducted a telephone poll of the Union's Executive Board on the question of whether Plaintiff was entitled to a lateral transfer with backpay to the Springfield facility under the arbitration award, given Plaintiff's resignation for other reasons.  (Doc. 4 at ¶ 15; Minick Dep. at 44-46; Zahn Dep. at 45, 68-75; Doc. 34, Ex. 20 at 5).  The members of the Executive Board were provided with a copy of the arbitration award, copies of Plaintiff's two resignation letters, a copy of the December 1, 2008 letter from O'Hara to Plaintiff indicating the Union's position, and a copy of notes and letters indicating Plaintiff's position.  (Doc. 34, Exs. 20-23).  Zahn also explained the reported statements by Plaintiff against Moss and that he would be disruptive at

---

Executive Board as Michael O'Hara's legal opinion on Plaintiff's entitlement to the benefits of the Arbitration Award."  (Doc. 38 at 5).  On reading the letter, it is clear that it expresses O'Hara's legal opinion, and so it is inaccurate to characterize it as "false," which implies that O'Hara was lying about his legal opinion.  Plaintiff presents no evidence that O'Hara was in fact lying about his true legal opinion in the letter, so the Court takes this letter to be an accurate representation of O'Hara's legal opinion.  Whether the legal opinion was reasonable is discussed below.

Springfield.[15]  (Zahn Dep. at 134).  Zahn, Minick, and another officer abstained from

the vote, as they had been involved either with Plaintiff's case or with the

organizing effort at Springfield.   (Zahn Dep. at 123).   Other than their three

abstentions, the vote resulted in a unanimous vote that Plaintiff was not entitled to

a lateral transfer to the Springfield facility under the arbitration award.  (Doc. 4 at

¶ 15; Doc. 34, Ex. 20; Zahn Dep. at 69).   O'Hara communicated this decision to

Plaintiff by a letter dated December 19, 2008.  He noted that the Executive Board

had

> reached the conclusion that it would not be in the best interest of the
> Local Union, its membership, or the bargaining unit members, to
> pursue any further claims related to your assertion of additional
> monies owed by Sunbelt to you, or with respect to any claim that you
> are entitled to an offer of lateral transfer to the Springfield facility at
> this date in time.  The Executive Board considered the fact that you
> evidently had unilateral discussions with Company personnel prior to
> the Decatur facility closing that entailed terms and conditions for your
> individual transfer to another Sunbelt facility -- discussions of which
> the Local Union was not apprised -- as well as your decision to ignore
> (or not accede to) the Local Union's specific direction not to resign in
> January, 2008.

He explained the Union's position that Plaintiff's resignation, as it was based on

Sunbelt's failure to transfer him to Champaign, had "wholly undermined" the claim

that he should be encompassed by the arbitration award.  (Doc. 30, Ex. 9 at 13).

By a letter to Sunbelt dated January 7, 2009, Plaintiff, through his attorney,

demanded that the arbitration award be enforced on his behalf, with reinstatement

to Springfield and backpay.  (Doc. 4, Ex. D).  The Union responded to this letter by a

letter dated January 9, 2009, which stated that the Union would

---

[15]   Plaintiff disputes making those statements, but does not present any
evidence disputing that Zahn actually relayed this information to the Executive
Board.  (Hardwick First Supp. Aff. at ¶ 41).

> consider filing a Petition to Confirm the Arbitration Award, and thereafter seek to have Mr. Hardwick encompassed by such 'lateral transfer' provision, but only if Mr. Hardwick is willing to agree…to pay the Local Union's attorney's fees and costs for litigating the matter if, in fact, the Federal Court determines that Mr. Hardwick is not encompassed by said terms of the Arbitration Award.

If Plaintiff made this agreement, the Executive Board would take up the matter to "expedite the filing of a Petition to Confirm." (Doc. 4, Ex. E at 2-3). The letter explained the Union's belief that there were three facts undermining Plaintiff's claim to a lateral transfer with backpay under the arbitration agreement: Plaintiff had resigned prior to the closing of the Decatur facility, his resignation was motivated by reasons other than Sunbelt's refusal to transfer him to Springfield, and he had informed Union members that the only reason he sought a transfer to Springfield was to be disruptive there.[16] (Doc. 4, Ex. E at 1-2).

Plaintiff, through his attorney, replied on January 13, 2009, requesting documentation from the Union as to Plaintiff's reasons for resigning and his statements that he would be disruptive at Springfield. (Doc. 34, Ex. 22). On that same date, the Union responded by sending copies of Plaintiff's resignation letters and explaining its position. (Doc. 4, Ex. F). On January 20, 2009, Plaintiff, through

---

[16]    Plaintiff states that there were three reasons given, but then lists four, the additional one being that "Plaintiff negotiated directly with Sunbelt for transfer to another location, other than Springfield." (Doc. 38 at 5). While the letter did mention this, it did not list it as one of the reasons for the Union's opinion.

Further, in response to Sunbelt's iteration of the Union's offer, and its statement that Plaintiff rejected the offer, discussed below, Plaintiff states that he disputes the fact. (Doc. 29 at 19; Doc. 35 at 5). However, he cites only to his own affidavit explaining the reasons that he refused the Union's offer to enforce the agreement on his behalf, not any evidence suggesting that the Union did not send him the letter in question or that his attorney did not reject the offer on his behalf. Thus, there is no reason to believe that the offer was not made by the Union, or that the offer was not rejected by Plaintiff.

his counsel, indicated his belief that he should not be required to pay the attorney's fees and expenses, and that the Union was "effectively refusing to attempt to enforce the arbitration award on his behalf." (Doc. 4, Ex. G).

## DISCUSSION

Plaintiff filed his initial complaint on February 13, 2009, in McLean County, Illinois, against only Sunbelt; he sought to confirm the arbitration award against Sunbelt. (Doc. 1). Sunbelt removed the case to this Court pursuant to 28 U.S.C. §§ 1441 and 1446, as the federal Labor Management Relations Act governs actions to confirm arbitration awards under a CBA. Plaintiff filed his Amended Complaint in this Court on March 31, 2009, adding the Union as an additional Defendant. (Doc. 4). The Amended Complaint seeks confirmation of the arbitration award against both Defendants, charges Sunbelt with breach of the CBA, and charges the Union with breach of its duty of fair representation.

The parties agree in their briefs that this type of action is subject to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. *Cleveland v. Porca Co.*, 38 F.3d 289, 296 fn. 5 (7th Cir. 1994) (*citing Martin v. Youngstown Sheet & Tube Co.*, 911 F.2d 1239, 1244 (7th Cir.1990)). As employees are not parties to CBAs or arbitration awards between their employers and their unions, an employee may bring suit to confirm an arbitration award only if the employee states a § 301 fair representation claim and the confirmation of the award is integral to that claim. *Id.* at 297 (*citing Martin*, 911 F.2d at 1244). Likewise, an employee's claim against his employer is "interlocked" with his claim against his union; each must succeed or

both fail. *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997) (*citing White v. General Motors*, 1 F.3d 593, 595 (7th Cir. 1993)).

The parties' respective Motions for Summary Judgment thus cover the same essential legal issue: whether the Union breached its duty of fair representation. Without withstanding or winning summary judgment as to that issue, Plaintiff cannot withstand or win summary judgment to "confirm" the arbitration award or on the issue that Sunbelt breached the terms of the CBA. *See, e.g., Porca*, 38 F.3d 289, 296-97. Both Defendants argue that the Union did not breach this duty as a matter of law, while Plaintiff argues that the Union did, as a matter of law, breach its duty by "failing to enforce the lateral transfer to Springfield portion of the Arbitration Award," and by "failing to enforce the back pay portion of the Arbitration Award."[17] (Doc. 31 at 2). As all of the parties' briefs cover this primary issue, which is dispositive, the Court will proceed directly with the analysis of it, rather than treating each Motion for Summary Judgment separately.

All union activities are subject to the union's duty of fair representation, which is breached if the union's actions were "arbitrary, discriminatory, or in bad faith," which are separate elements.[18] *Air Line Pilots Ass'n, Inter. v. O'Neill*, 499

---

[17]    In his Motion for Partial Summary Judgment, Plaintiff also argues that his resignation is "not a defense to enforcement of the Arbitration Award," that his suit "is not barred by the six-month statute of limitations," that his alleged statements against Moss and that he would be disruptive at Springfield are not "a defense to enforcement of the Arbitration Award," and that he is entitled to a lateral transfer to Springfield with backpay. (Doc. 31 at 1-2). Given the Court's disposition of the fair representation issue, it is not necessary to address each of these specifically.

[18]    In his Motion for Partial Summary Judgment, Plaintiff argues that the "Union has either acted (1) arbitrarily and/or (2) discriminatorily and/or (3) in bad faith." (Doc. 33 at 12, 14). He does not discuss which particular actions of the

U.S. 65, 67 (1991); *Nida v. Plant Protection Ass'n Nat.*, 7 F.3d 522, 526 (6th Cir. 1993) (*O'Neill's* deferential standard applies to union's actions pursuant to an arbitration award).   "Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union." *O'Neill*, 499 U.S. at 78.  Therefore, the Court's review of a union's actions "must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities."[19] *Id*.  A union breaches its duty of fair representation "[o]nly [if it shows] an egregious disregard for union members' rights."  *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1176 (7th Cir. 1995) (*quoting Castelli v. Douglas Aircraft Co.*, 752 F.2d 1480, 1483 (9th Cir. 1985).  "What is required to be shown goes considerably beyond the requirements of a [legal] malpractice suit."  *Id*.  Further, it is not a breach of the duty of fair representation for "[a] union [to] settle a dispute after it has gone to arbitration,"[20] so long as its handling of it is not arbitrary, discriminatory, or in bad

---

Union are alleged to be arbitrary, discriminatory, or in bad faith, leaving it to the Court to categorize his arguments.

[19]   Plaintiff's Motion for Partial Summary Judgment speaks repeatedly of the Union's failure to offer good "defenses" to its decision not to enforce the arbitration award through litigation.  (Doc. 33).  This is not the appropriate term - the Union (or Sunbelt), was not required to litigate the arbitration award if such a decision was reasonable, not discriminatory, and in good faith.  The Defendants need not present "defenses" to enforcement, as such.

[20]   Plaintiff cites to the Eleventh Circuit case of *Samples v. Ryder Truck Lines, Inc.*, for the proposition that "a union's failure to force the employer's compliance with an arbitration award already rendered would raise a strong question as to the adequacy of its representation."  755 F.2d 881, 886 (11th Cir. 1985).  Plaintiff also cites *Carrion v. Enter. Ass'n*, which held that "a union's duty of fair representation includes the union's duty to enforce an arbitration award."  227 F.3d 29, 33 (2d Cir. 2000).  *But see Sanozky v. International Ass'n of Machinists and Aerospace Workers*,

faith.  *Porca*, 38 F.3d at 296 (*citing Antrim v. Burlington Northern, Inc.*, 847 F.2d 375, 378-79 (7th Cir. 1988); *Nida*, 7 F.3d at 526).

## I.   Arbitrariness

Arbitrariness is judged by an objective standard, and, to be arbitrary, the union's conduct must be "so far outside a wide range of reasonableness that it is wholly irrational or arbitrary."  *Crider*, 130 F.3d at 1243 (*quoting O'Neill*, 499 U.S. at 78).  Plaintiff claims that it was arbitrary for the Union to "fail to enforce" the arbitration award on his behalf.  He appears to fault the Union for its initial attempt to settle his claim to reinstatement and backpay, for its handling of that settlement attempt, and for its initial refusal to litigate and subsequent conditional offer to litigate his claim.  The Court finds that the Union's course of action regarding the application of the arbitration award to Plaintiff was not arbitrary, as a matter of law.

---

415 F.3d 279, 283 (2d. Cir. 2005) ("the failure to enforce an arbitration award must still be viewed in the overall test of whether such action was arbitrary, discriminatory or in bad faith").

Setting aside the precedential weakness of *Samples* and *Carrion* discussed by the Union, the proposition that a union must press its enforcement of an award to the fullest possible extent flies in the face of *Porca*, in which the Seventh Circuit held that a union's decision to settle a dispute about an arbitration award, rather than litigating to enforce the award or returning to the arbitrator for clarification, was not a breach of its duty of fair representation.  38 F.3d at 296 ("a union may settle a dispute after it has gone to arbitration").  Where the Seventh Circuit has implicitly disapproved a principle stated by another Circuit, this Court will follow the Seventh Circuit.

Finally, as is discussed throughout this opinion, there are substantial questions as to the arbitration award's applicability to Plaintiff - an award need not be "enforced" on behalf of one to whom it does not apply.  For the employees to whom the award clearly applied, the Union did "enforce" the award to its full extent; it reasonably offered to settle, rather than litigate, the claims of the employees such as Plaintiff, whose status under the award was more tenuous.

Defendants have pointed out that there were several reasons the applicability of the award to Plaintiff was in doubt, which renders the Union's willingness to compromise with Sunbelt, unwillingness to litigate Plaintiff's claim, and subsequent conditional offer to litigate reasonable. *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1298 (7th Cir. 1992) ("it is sometimes helpful to look at the arguable merits of the union's proffered interpretation of a contract in order to determine whether a union breached its duty of fair representation in failing to arbitrate a grievance."). Sunbelt had good arguments against Plaintiff's interpretation of the arbitration award, in that Article 19's language, which was the source of the arbitration award, required that an employee eligible for reinstatement be "displaced" by the closure of the Decatur facility, not that he resign from Sunbelt for other reasons. Given this language in Article 19, it is reasonable to interpret the arbitration award's language applying to "employees within the bargaining unit at the time of its January 11, 2008 announcement of the Decatur center's closing" to be conditioned upon those employees' "displacement" by the closure. Indeed, the arbitration award may have been in conflict with the language of Article 19 if Plaintiff's interpretation were adopted - Article 19 requires "displacement," while the award appears merely to require employment on January 11, 2008.[21] In addition, the arbitration award's grant of backpay is conditioned on the employee's loss of income being "as a result of" Sunbelt's failure to transfer him

---

[21]    As pointed out by Sunbelt, there may have been a risk that Sunbelt would itself appeal the award as inconsistent with Article 19. *United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987) (court may overturn arbitrator's award where it does not "draw its essence from the collective bargaining agreement").

to Springfield after the Decatur closure; Plaintiff's income loss was not a "result of" Sunbelt's failure to transfer him to Springfield, but began when he resigned prior to that closure for other reasons.

Where there were significant doubts as to Plaintiff's case, the Union was entitled to consider the expense and impact on the other bargaining unit members of demanding full application of the arbitration award to Plaintiff and eventual litigation, and decide that either a settlement or conditional offer to litigate was the best course of action.[22]  *See Porca*, 38 F.3d at 296 (*citing Nida*, 7 F.3d at 526) (settlement of ambiguous arbitration award reasonable where there was a risk that employee's preferred position would be rejected by arbitrator on rehearing); *Nida*, 7 F.3d at 526 (not unreasonable for union to settle dispute over arbitration award's application with employer).  *See also O'Neill*, 499 U.S. at 78 (reasonableness must be evaluated "in light of both the facts and the legal climate that confronted the negotiators at the time the decision was made").  Indeed, in this case, the Court finds that, given the weakness of Plaintiff's claim, coupled with the fact that he had deliberately disregarded the Union's previous warning not to resign, it would have been reasonable for the Union to refuse to press Plaintiff's claim under the

---

[22]    The Court is inclined to agree with Defendants that Plaintiff's interpretation of Article 19 and the arbitration award, read together, is incorrect.  A court may consider the merits of the underlying claim against the employer in evaluating a fair representation case, as there is no benefit to allowing an employee to pursue a fair representation claim where the underlying claim against the employer lacks merit.  *Ooley*, 961 F.2d at 1298 ("sometimes it is appropriate for the court to determine if the plaintiffs' contractual claims are meritless as a matter of law").  As Plaintiff was not "displaced" by the closure, and did not suffer income loss "as a result of" Sunbelt's failure to transfer him, he was not entitled to reinstatement and backpay.  However, as none of the parties have made this argument (and have not presented evidence specifically in support of it), the Court does not base its decision on this ground.

arbitration award at all.  *See Trnka v. Local Union No. 688, United Auto., Aerospace & Agriculture*, 30 F.3d 60, 61-62 (7th Cir. 1994) ("so long as a colorable argument could be made at the time of the union's decision to drop its support that the grievance is meritless (and the union did not then treat substantively similar grievances differently from the plaintiff's), the decision cannot be regarded as arbitrary").

Plaintiff also argues that the fact that in his November 7, 2008 demand letter to Sunbelt, O'Hara stated that "Mr. Har[d]wick resigned prior to the Decatur closing only because he was not offered a comparable position as that which he held at the Decatur facility," is an admission by the Union that Plaintiff's resignation was indeed motivated by the Decatur plant's closing, such that he would be entitled to application of the award, and that the Union later wrongfully changed its position on Plaintiff's entitlement to reinstatement to Springfield with backpay. This letter, and the subsequent documents showing the Union's doubts about Plaintiff's case, do not reveal any unreasonable action by the Union.  It was not unreasonable for O'Hara to present Plaintiff's strongest position in the first demand letter pursuant to the award, including citation to Plaintiff's favorable testimony at the arbitration hearing that he quit because of the closure, though O'Hara might have also known that Plaintiff's other stated reasons undermined his claim.  It is also not unreasonable for a party to change its negotiating position when presented with new evidence or resistance from the other party, especially where the Union did believe all along that Plaintiff's case was the weakest because of his resignation. Instead of showing arbitrary behavior, this initial strong demand showed the

Union's efforts to obtain the best result possible for Plaintiff, though Plaintiff's actions had severely undermined his position.

In a related vein, Plaintiff argues that O'Hara's December 1, 2008 letter "falsely" states that he was not eligible for application of the award because of his pre-closing resignation, and that this legal opinion is evidence of the Union's arbitrary behavior. A plaintiff challenging a union's interpretation of a contract must "not merely to demonstrate that his favored reading of the labor contract is as plausible as the union's,…but rather [must] show that the union's reading could eventually be deemed not even colorable, thus creating an issue of material fact regarding arbitrariness." *Trnka*, 30 F.3d at 61-62. First, as noted above, to characterize O'Hara's statement of his legal opinion as "false" is inaccurate, as Plaintiff provides no evidence that O'Hara did not indeed hold this legal opinion.

Further, O'Hara's legal opinion on this issue was a reasonable one. O'Hara's opinion, as expressed in the letter, was based on Plaintiff's own assertions to Sunbelt that the reason for his resignation was Sunbelt's failure to honor its promise to transfer him to Champaign and his complaints about Moss. As discussed above, Plaintiff's resignation, prior to the closure of the Decatur facility, for reasons other than that closure and Sunbelt's failure to transfer him to Springfield, arguably placed him outside of eligibility for transfer under Article 19, which is the source of the arbitration award's authority. Plaintiff was also not entitled to backpay under the arbitration award itself, which provides that employees are entitled to backpay "to the extent that any of those employees suffered loss of wages as a result of [Sunbelt's] failure to" transfer them to

Springfield. An employee who resigned for other reasons (*i.e.*, failure to transfer to Champaign and dissatisfaction with management) did not suffer a loss of wages "as a result" of the employer's failure to transfer him.

Where, as here, there were competing interpretations of the language of Article 19 and the arbitration award, and where the arbitration award may have indeed been in conflict with Article 19 under Plaintiff's construction, it was entirely reasonable for the Union to decide not to expend its resources for the uncertain benefit of only one member of the bargaining unit.[23] Instead, the Union attempted

---

[23]   Plaintiff argues that the arbitration award "clearly" applied to him, and attempts to support this contention by pointing out that the arbitrator was aware that he had resigned from Sunbelt prior to the Decatur facility's closure. The fact that the arbitrator knew Plaintiff had resigned, however, does not show that he intended Plaintiff's actual situation of having resigned for reasons unrelated to the Decatur facility's closure and Sunbelt's refusal to transfer him to Springfield to be covered by the award - under Article 19, Plaintiff had to have been "displaced" by the closure in order to get a transfer, and it is at least arguable that he was not so "displaced," as discussed above. In addition, Plaintiff's argument fails to take into account the award's potential conflict with Article 19 under his interpretation, discussed above, and the risk that this conflict posed when litigating the enforcement of the award on Plaintiff's behalf. The arbitrator was not empowered to change the terms of the CBA. The backpay portion of the award was clearly inapplicable to Plaintiff, as his income loss was not "as a result of" the closure. Finally, even though the Union knew of Plaintiff's stated reasons for his resignation, it had no reason to voluntarily inform the arbitrator of them - remaining silent as to that issue potentially increased the chances that Plaintiff would be able to benefit from a favorable award in the event that Sunbelt did not dispute his eligibility.

Plaintiff also claims that his "reservations of rights" under Article 19 in the Union-drafted letters of January 15 and 18, 2008 operate to immunize him from the effect of his later resignation. Given Plaintiff's January 25, 2008 resignation, and his stated reasons for the resignation, it was not unreasonable for the Union to conclude that he had effectively waived his rights under Article 19 and thus the arbitration award that followed from it, as Article 19 requires that the employees be "displaced" by the facility closure in order to be eligible for transfer. A "reservation of rights" is not a license to act in contravention of conditions upon those rights, and Plaintiff had been well-advised that he should not resign from Sunbelt.

to reach a settlement with Sunbelt.[24]   Only after Plaintiff rejected the Union's negotiated settlement and repeatedly asserted his right to transfer with backpay, in the face of the Union's quite-reasonable explanations of his tenuous legal position, did the Union determine that further efforts on his behalf were not in the interests of the bargaining unit.   After Plaintiff demanded that the Union litigate his claim against Sunbelt, the Union offered to undertake such litigation expeditiously, so long as Plaintiff bore some of the risk of his demand, rather than forcing the bargaining unit to undertake the risk and expense when the Union had reasonably determined that the chances of success were slight.[25]   The Court finds that this was

---

[24]   Plaintiff asserts that it was unreasonable for the Union to compromise with Sunbelt in this way, arguing that it "should not have been difficult for the Union to demand" and that Sunbelt "likely would have agreed, since the Arbitration Award clearly provides for both a lateral transfer and back pay."  (Doc. 38 at 13-14).  First, Plaintiff has absolutely no evidence that Sunbelt would have agreed to this position upon further pressure by the Union.  Second, as discussed above, the Union's and Sunbelt's doubts about the viability of Plaintiff's position were reasonable - it was not "clear" that the award applied to him - and it was therefore within the discretion of the Union not to press the claim beyond the compromise reached.  *See O'Neill*, 499 U.S. at 80 (where there is a realistic possibility that the employer would not abandon its position, not unreasonable for the union to seek settlement).

[25]   Plaintiff characterizes the Union's offer to expeditiously litigate his claim so long as Plaintiff agreed to cover the attorneys' fees and expenses if the claim were unsuccessful as a refusal to enforce the arbitration award.  Such a conditional offer is clearly not a refusal.  Plaintiff makes much of the letter's use of the word "consider," but the letter as a whole, especially in light of the language indicating that the "matter *will* be taken up by the Local Union's Executive Board so as to expedite the filing of a Petition to confirm" (emphasis added) shows that this was an offer, not a refusal.  A party's statement that it would "consider" taking an action is patently not a refusal to take that action.

Moreover, the Union was entitled to protect the interests of its other bargaining unit members by not pursuing potentially-fruitless claims for the benefit of only one member.  *See Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003) (*citing Reed v. International Union of UAW*, 945 F.2d 198, 203 (7th Cir. 1991); *Rupe v. Spector Freight Sys., Inc.*, 679 F.2d 685, 691 (7th Cir. 1982)) (Union "has discretion to act in consideration of such factors as the wise allocation of its

a reasonable course of action, well within the "wide range of reasonableness" articulated in *O'Neill*.

Plaintiff and Defendants differ on whether Plaintiff was told about the negotiations between Union and Sunbelt resulting in the agreement that Plaintiff could be transferred to Springfield but receive no backpay. Construing this dispute in Plaintiff's favor to find that he was not actually informed of this offer, the Court finds that this decision by the Union did not render its actions arbitrary. The law is clear that it is the Union's province to negotiate employees' claims with the employer, and that the Union is entitled to resolve those claims in a reasonable manner, taking into account

> many considerations and interests, including the effect of various resolutions of the grievance on other employees, the requirements of group organization and coherence, the desire for consistent treatment of similar claims, the appropriate allocation of limited resources for pursuing both individual and group claims, the maintenance of the Union's bargaining power and the necessity of maintaining an effective continuing relationship with the employer

---

own resources, its relationship with other employees, and its relationship with the employer."); *Rupe*, 679 F.2d at 691 (*quoting Baker v. Amsted Industries, Inc.*, 656 F.2d 1245, 1250 (7th Cir. 1981)) ("the Union must be allowed the discretion to balance many considerations and interests, including the effect of various resolutions of the grievance on other employees, the requirements of group organization and coherence, the desire for consistent treatment of similar claims, the appropriate allocation of limited resources for pursuing both individual and group claims, the maintenance of the Union's bargaining power and the necessity of maintaining an effective continuing relationship with the employer.").

Finally, the Union had already undertaken a reasonable level of "enforcement" of the arbitration award on Plaintiff's behalf, given the doubts about his eligibility under it - even if the Union had never made the offer to litigate, its actions up to that point would have been reasonable. Where the Union could have refused to litigate Plaintiff's claim altogether, it is by definition reasonable for the Union to agree to litigate with certain protective conditions.

*Rupe*, 679 F.2d at 691 (*quoting Baker v. Amsted Industries, Inc.*, 656 F.2d 1245, 1250 (7th Cir. 1981)).  The handling of an employee's grievance is left to the discretion of the union, which "may also consider the merits of the case or the effect on the larger collective bargaining unit in making various strategic decisions during the grievance procedure." *Garcia v. Zenith Electronics Corp.*, 58 F.3d 1171, 1176 (7th Cir. 1995) (*citing NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967); *Vaca v. Sipes*, 386 U.S. 171, 191 (1966); *Griffin v. Air Line Pilots Assoc.*, 32 F.3d 1079, 1083 (7th Cir.1994)).  "The interests of individual employees sometimes may be compromised for the sake of the larger bargaining collective." *Id.* So long as its handling of a claim is not arbitrary, discriminatory, or in bad faith, the Union's decision on how to settle a claim short of arbitration (or here, litigation) is not a breach of the Union's duty. *Vaca*, 386 U.S. at 191.

On November 7, 2008, the Union and Sunbelt agreed to settle Plaintiff's claim by having him transfer to Springfield without backpay.  On November 10, 2010, at the "sidebar" discussion, after hearing that Sunbelt was reluctant to reinstate Plaintiff because of his comments criticizing Moss, and given the information that Plaintiff had said to Minick that he disliked Moss and wanted to be a disruption at Springfield, the Union offered an alternate settlement agreement of a severance package, which Sunbelt accepted.[26]  On November 15, 2008, Plaintiff met with Zahn, Minick, and O'Hara, and was apparently only told of a severance

---

[26]    As there is no evidence that the Union had reason to believe that Minick was not telling the truth when he said that Plaintiff had made these statements to him, it was not unreasonable for the Union to rely on the information.

package offer.[27]  On November 17, 2008, Plaintiff rejected this offer, and reiterated his belief that he was entitled to both reinstatement and backpay.  The only reasonable inference from these facts is that the Union, given the two offered settlements, chose to go with the one, severance, that best served the interests of the bargaining unit as a whole.

This choice was not arbitrary, as it served the Union's interests in "group organization and coherence[,]…the maintenance of the Union's bargaining power and the necessity of maintaining an effective continuing relationship with the employer."  *Rupe*, 679 F.2d at 691.  Where the Union had information that the employer was reluctant to reinstate Plaintiff, and that Plaintiff had criticized Sunbelt's district manager's management style, had expressed his personal dislike of the manager, and had stated that he wanted to be transferred to Springfield in order to be disruptive, it was reasonable for the Union to find that, between the two alternatives, severance of Plaintiff's employment would be a better choice than allowing him to work at Springfield, where he could undermine the group's coherence and the Union's continuing relationship with Sunbelt.  *Garcia*, 58 F.3d at 1176 (7th Cir. 1995) (*citing Allis-Chalmers Mfg. Co.*, 388 U.S. at 180) ("The interests of individual employees sometimes may be compromised for the sake of the larger bargaining collective."); *Jenkins v. United Rubber, Cork, Linoleum and Plastic Workers of America, Local 959*, 5:95-cv-116-DE, 1996 WL 934595, *3 (E.D. N.C. Aug. 12, 1996) (*aff'd by Jenkins v. Nettles*, 121 F.3d 698, 1997 WL 499932, *2 (4th Cir.

---

[27]     Plaintiff asserts that he was only informed of a $300 severance package, not the $3500 package that was apparently negotiated at the sidebar.  This discrepancy is immaterial, though, as the Union was entitled to negotiate the settlement of the claim.

1997)) (no breach where rejected offer of settlement from union and failed to inform employee of offer).  *See also O'Neill*, 499 U.S. at 79 (settling rather than unilaterally terminating strike, though worse choice, not arbitrary).

Indeed, Zahn testified that, upon Minick's telling him about Plaintiff's alleged comments regarding Moss and that he would be disruptive at Springfield, he "was concerned about the remainder of the bargaining unit, the other employee that would be involved there.  It is hard enough - labor relations today are hard enough without somebody being there that is trying to be not a team player and actually work against the team."  (Zahn Dep. at 110-110).  The fact that Sunbelt never explicitly withdrew its offer of reinstatement without backpay is irrelevant - where there were two alternatives offered, it was not unreasonable for the Union to choose between them based on its legitimate concerns.[28]  Plaintiff has failed to show

---

[28]    Plaintiff also argues that Union representatives wrongfully failed to tell the Union's Executive Board about the settlement deal between the Union and Sunbelt for Plaintiff's lateral transfer without backpay prior to the vote on Plaintiff's eligibility under the arbitration award.  It is unclear whether Plaintiff's argument on this point is addressed to the claim that the Union acted arbitrarily or in bad faith; either way, the argument is without merit.  The failure to tell the Executive Board about this deal was not arbitrary or in bad faith because the information was not relevant to the Board's determination of whether Plaintiff was entitled to benefits under the arbitration award - the Executive Board was deciding his eligibility under the *award*, not under a separate settlement agreement.  Any litigation to confirm the award that might have resulted from the Executive Board's decision to press forward with Plaintiff's claim would have focused on Article 19 and the award, not on settlement negotiations between Sunbelt and the Union.  Further, as discussed above, by the time of the Executive Board vote, Plaintiff had rejected the Union's negotiated settlement of severance pay, and so the issue of the proposed settlement deals was no longer relevant.

        Similarly, Plaintiff appears to argue that it was wrongful for the Union to share with Sunbelt's representatives at the November 2008 "sidebar" the information received by the Union that Plaintiff had made comments against Moss and to the effect that he wanted to be a disruption at Springfield.  Defendants do not dispute that this information was shared.  This sharing of information was

a genuine issue of material fact as to whether the Union's conduct in handling his claim to benefits under the arbitration award was arbitrary.

## II.   Discrimination and Bad Faith

The analyses of whether a union's conduct is discriminatory or in bad faith are separate, but related; they turn on the "subjective motivation of the Union officials." *Crider*, 130 F.3d at 1243 (*citing Trnka v. Local Union No. 688, UAW*, 30 F.3d 60, 63 (7th Cir. 1994)). "To establish discrimination or bad faith, [the employee] must prove the existence of an improper motive behind the [union's] actions, and point to specific facts that support the finding of such a motive." *Cintron v. Sysco Food Services of Chicago, Inc.*, 96-c-1632, 1997 WL 457500, *5 (N.D. Ill. Aug. 7, 1997) (*citing O'Neill*, 499 U.S. at 74-75; *Rawson*, 495 U.S. at 372).

### A.   Discrimination

Plaintiff claims that it was discriminatory for the Union to "enforce" the arbitration award on behalf of other employees while refusing to do so for him. As Plaintiff notes, discrimination turns on "a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." (Doc. 38 at 19 (*quoting* BLACK'S LAW DICTIONARY)). Therefore, where

---

neither arbitrary nor in bad faith. First, there is no evidence that the Union's representatives knew or had any reason to believe this information was false (assuming, as Plaintiff contends, that it was false), so it was not unreasonable to rely on it. Further, to the extent Plaintiff argues that the Union should not have shared unflattering information about him with Sunbelt, this action does not render the Union's conduct toward Plaintiff unreasonable or in bad faith, as there is no evidence that Sunbelt's bargaining position toward Plaintiff changed because of it - as Plaintiff repeatedly points out, Sunbelt did not withdraw its offer of transfer without backpay on hearing this information. (Doc. 32 at ¶ 89). *Porca*, 38 F.3d at 295 fn. 4 (*citing Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1397 (9th Cir. 1986) ("must be a causal relationship between the union's unfair representation and the injury").

there is a meaningful and relevant distinction between different persons, it is not discriminatory to treat them differently.  *See O'Neill*, 499 U.S. at 81 (distinction between employees based on rational compromise not prohibited invidious discrimination); *Crider*, 130 F.3d at 1244 (a "reasonable distinction" between employees' situations justifies different treatment).  First, it must be noted that the Union did not litigate the arbitration award on behalf of any employee; no employee was "favored" in this way.  Second, for the majority of the employees, Sunbelt did not question their eligibility under the award, so the Union did not "favor" them by permitting Sunbelt to give them the full benefit of the award.  Finally, and most important, Plaintiff was the only employee who resigned prior to being laid off by Sunbelt, and his stated reasons for doing so were not the Decatur facility's closure and Sunbelt's failure to transfer him to Springfield.  This was a significant distinction between himself and the others, because, as noted above, it created a substantial doubt as to the applicability of Article 19 and the arbitration award to him.

Further, it was not discriminatory for the Union to offer Plaintiff the negotiated severance package, rather than the reinstatement without backpay offered to Daniels and Brehm.  As noted above, the Union had information that Sunbelt was reluctant to reinstate him, and that Plaintiff had criticized Moss' management style, had expressed his personal dislike of Moss, and had stated that he wanted to be transferred to Springfield in order to be disruptive.  There is no evidence that there were similar concerns about Daniels and Brehm.  These concerns, as discussed above, constituted a non-arbitrary basis on which the Union

could choose between the two settlement alternatives; they also constitute a substantial difference between Plaintiff and the two employees who were offered reinstatement. Plaintiff has failed to show that there is a genuine issue of material fact as to whether the Union handled his claim in a discriminatory manner.

**B.      Bad Faith**

Finally, Plaintiff presents no evidence of bad faith, or subjectively wrongful motivation, on the part of the Union. *Trnka*, 30 F.3d at 63 ("where innocent or multiple explanations for a defendant's actions abound a plaintiff must rely on more than *post hoc*, *propter hoc* reasoning," to show bad faith). Indeed, the undisputed facts show that the Union made reasonable efforts to reach a resolution of Plaintiff's claims that was satisfactory to him, even agreeing to expeditiously litigate his claim to entitlement under the arbitration award, though it was not required to do so in order to carry out its duty of fair representation. *Cf. Ooley*, 961 F.2d at 1303 (bad faith shown where union attorney admitted that union's true reason for dropping grievance was to protect itself from litigation by employees). Further, the Union successfully pressed Plaintiff's grievances related to compensation for extra work he had performed at Sunbelt, which is evidence of a lack of bad faith. *Crider*, 130 F.3d at 1244 (no bad faith where union representatives tried to broker settlement for employee and pursued other grievances on his behalf) (*citing Souter v. Int'l Union, UAW*, 993 F.2d 595, 599 (7th Cir. 1993)).

Plaintiff, though he does not clearly set out which facts he sees as evidence of bad faith and which as evidence of discrimination or arbitrariness, appears to point to several facts that he might be construing as evidence of bad faith. He claims that

the Union's change of position as to his entitlement under the arbitration award is evidence of bad faith. On the contrary, the evolution of a bargaining position in response to resistance from the opposite party and new information is a normal and beneficial part of negotiation. Further, any reliance by the Union in its decision-making process on information that Plaintiff disliked Moss and had threatened to be a disruption at Springfield is not evidence of bad faith, as Plaintiff has shown no evidence that the Union knew or had reason to know that the information was false - good-faith reliance on apparently true, relevant information cannot be considered bad faith. The Union's suggestion of a severance deal for Plaintiff during the November 2008 "sidebar" meeting is likewise not evidence of bad faith, but is rather a further attempt to reach a compromise where Plaintiff had a weak claim and the Union did not want to waste resources pressing potentially-fruitless litigation or risk Sunbelt's appeal of the award, thereby losing its benefits for all the bargaining unit members; it was a reasonable response to the Union's concerns about Plaintiff, as discussed above, and there is no evidence that it was in bad faith to engage in the discussion. In addition, the offer to litigate Plaintiff's claim, though conditional, is not evidence of bad faith, but instead shows a willingness to work for Plaintiff's interests while trying to protect the interests of other bargaining unit members.[29]

---

[29]     Plaintiff presents his hypotheses that the Union acted in bad faith either because (1) it "decided not to enforce the Arbitration Award on behalf of Plaintiff, as a bargaining concession to Sunbelt Rentals, while they were negotiating the new Collective Bargaining Agreement for the Springfield facility," or (2) "the Union was motivated by ill will and hostility toward the Plaintiff" and therefore dropped the pursuit of his claim after the Springfield employees had voted for the Union to represent them such that he was no longer needed as a pro-Union vote in Springfield. (Doc. 38 at 18). Plaintiff identifies no facts in support of either of these hypotheses about the Union's motivations, other than the facts that the Union was

Likewise, the Union's failure to inform Plaintiff of the reinstatement without backpay offer from Sunbelt was not in bad faith.   First, Plaintiff presents no evidence of an improper motive by the Union.   Further, the Union's course of conduct in dealing with Plaintiff's claim shows that the Union was working to reach some kind of favorable settlement with Sunbelt, though both Sunbelt and the Union believed that Plaintiff's claim was weak.   Indeed, since Plaintiff had deliberately disregarded the Union's advice not to resign from Sunbelt, the Union went "above and beyond" its responsibilities in attempting to correct the effects of Plaintiff's poor decision.   The weakness of Plaintiff's claim under Article 19 and the arbitration award meant that the Union could have, absent evidence of bad faith, refused to press his claim at all.   In this situation, it is not per se bad faith for the Union to take its legitimate concerns, discussed above, into account when deciding between alternative methods of resolving an employee's claim, even though that resulted in a less-advantageous settlement for Plaintiff.   *Garcia*, 58 F.3d at 1176 (7th Cir. 1995) (citations omitted) ("The union is therefore entitled to enjoy a somewhat different perspective than the individual employee it represents in a grievance matter." and "The interests of individual employees sometimes may be compromised for the sake

---

engaged in CBA negotiations and that the Springfield employees did vote for Union representation.   Plaintiff does submit his own affidavit stating that Minick told him that he would like Plaintiff to transfer to Springfield in time for the election, but the fact that the Union would have liked for Plaintiff to be working at Springfield prior to the union vote does not raise the inference that the Union harbored animosity toward him, or that it decided against reinstatement because the Springfield facility voted for the Union.   (Doc. 32 at ¶ 34).   The reasonable inference is instead that the Union would have wanted another union supporter at the Springfield facility. Where there is no evidence that either of these theories was actually a wrongful motivation for the Union's actions, no reasonable factfinder could find that the Union acted in bad faith toward Plaintiff.   *See Trnka*, 30 F.3d at 63.

of the larger bargaining collective."). Thus, Plaintiff has failed to show the existence of a genuine issue of material fact on the question of whether the Union acted in bad faith toward him.

### CONCLUSION

As Plaintiff has failed to show either that the undisputed facts show the Union to have breached its duty of fair representation, or that there are genuine issues of material fact as to that question, Defendant Sunbelt Rentals, Inc.'s Motion for Summary Judgment (Doc. 29) is GRANTED, Defendant International Union of Operating Engineers Local No. 965's Motion for Summary Judgment (Doc. 34) is GRANTED, and Plaintiff Eddie Hardwick's Motion for Partial Summary Judgment (Doc. 31) is DENIED. In addition, Plaintiff's Motion to Strike (Doc. 50) is GRANTED; Plaintiff's Memorandum filed January 7, 2010 (Doc. 43) is STRIKEN.


CASE TERMINATED.


Entered this 17th day of June, 2010.


                              s/ Joe B. McDade
                              JOE BILLY McDADE
                        United States Senior District Judge